# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

NJIDENWA EJIKEME,
    Plaintiff,

v.

MEYER CORPORATION, U.S., *et al.*,
    Defendant.

Civil Action No.
1:20-cv-05145-SDG

## OPINION AND ORDER

This matter is before the Court on Defendant TTK Prestige, LTD's renewed motion to dismiss [ECF 90] under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. For the following reasons, TTK's motion is **DENIED**.

## I.   BACKGROUND

TTK is an Indian manufacturer that markets itself as "India's number one kitchenware brand" and a "total kitchen solutions provider."[1] Of particular importance to TTK's portfolio are pressure cookers: TTK is the biggest brand in India's pressure cooker business at nearly four times the size of its nearest competitor, controlling 40 percent of the domestic market and selling over 6.5 million pieces in the fiscal year ending in 2020.[2] Relevant to this case are TTK's stovetop pressure cookers, bearing the Farberware brand name under a licensing agreement between Defendants Farberware Licensing Company, LLC and Meyer

---

[1]    ECF 74-14, at 3.

[2]    ECF 74-4, at 5–6.

Corporation, U.S.[3] Meyer, a trading intermediary, receives the Farberware-branded pressure cookers from TTK through non-party Meyer Trading Company Ltd. Hongkong, and delivers them to retailers like Defendant Walmart Inc.;[4] Walmart in turns sells thousands of the pressure cookers to consumers in the United States.[5]

Plaintiff Njidenwa Ejikeme bought a TTK-manufactured, Farberware-branded stovetop pressure cooker from a Wal-Mart store[6] in Lithia Springs, Georgia, in 2018.[7] On October 2, 2019, while Ejikeme was using the pressure cooker to prepare beans at home in her kitchen, its lid unexpectedly flew off and its hot contents spilled onto her.[8] Ejikeme suffered burns causing permanent dermatological and neurological damage,[9] and she sued for her injuries.[10] After TTK moved to dismiss claims against it for lack of personal jurisdiction,[11] the

---

[3]  *See* ECF 74-13, at 16.

[4]  ECF 91-1, at 6–7.

[5]  *See* ECF 74-13, at 17.

[6]  For clarity, this Opinion refers to Defendant Walmart as "Walmart" and to its stores as "Wal-Marts."

[7]  ECF 55, ¶ 23.

[8]  *Id.* ¶ 35.

[9]  *Id.*

[10] ECF 1.

[11] ECF 70.

2

Court granted Ejikeme's request for limited jurisdictional discovery.[12] At the close of discovery, TTK renewed its motion to dismiss.[13]

## II. DISCUSSION

For a court to have the power to "render a valid personal judgment against a nonresident defendant," the defendant must be subject to the court's personal jurisdiction. *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). A federal court has personal jurisdiction over a nonresident defendant if (1) authorized by the relevant state's long-arm statute and (2) consistent with the Due Process Clause of the Fourteenth Amendment. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010). Here, Ejikeme has established that this Court's exercise of personal jurisdiction over TTK satisfies both Georgia's long-arm statute and procedural due process.

### A. Legal Standard for Personal Jurisdiction

The Eleventh Circuit analyzes challenges to a court's personal jurisdiction through burden-shifting. The burden first falls on the plaintiff to make a *prima facie* case for the court's jurisdiction through allegations in the complaint. *Id.* at 1257. The burden then shifts to the defendant to rebut the allegations with "affidavit evidence." *Id.* Once the defendant introduces evidence, the burden "shifts back to

---

[12] ECF 75.

[13] ECF 90.

the plaintiff" to produce its own evidence in support of personal jurisdiction. *Id.* Where the plaintiff's and nonresident defendant's proofs conflict, courts must "construe all reasonable inferences in favor of the plaintiff," as in a motion for directed verdict. *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

### B. Personal Jurisdiction Is Authorized by Subsection (3) of the Georgia Long-Arm Statute.

Under Georgia law, the Court can exercise personal jurisdiction over TTK only if it has "do[ne] certain acts within the State of Georgia." *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Am.*, 279 Ga. 672, 673 (2005). These jurisdiction-conferring acts are listed in the long-arm statute, O.C.G.A. § 9-10-91. *Id.* Consistent with the Georgia Supreme Court's interpretation, § 9-10-91 is given a "literal construction." *Id.* And, as the Eleventh Circuit has explained, the statute "imposes independent obligations that a plaintiff must establish" distinct from due process. *Diamond Crystal*, 593 F.3d at 1258–59. Section 9-10-91 has three subsections; the third authorizes personal jurisdiction over a nonresident defendant that "derives substantial revenue from goods used" in Georgia, if the defendant "[c]ommits a tortious injury in this state caused by an act … outside this state" *and* the cause of action "aris[es] from" that act. O.C.G.A. § 9-10-91(3).[14]

---

[14] As written, subsection (3) requires a connection between the tortious out-of-state act and the cause of action, but *not* between the cause of action and the substantial revenue. (The latter is relevant to the due-process analysis.)

4

Subsection (3) gives the Court long-arm jurisdiction over TTK. According to Ejikeme's unrebutted allegations, TTK injured her in Georgia by defectively manufacturing her pressure cooker in India.[15] In other words, Ejikeme contends that TTK committed a tortious injury in Georgia caused by an act outside of it. And she has presented enough evidence to support the reasonable inference that TTK derives substantial revenue from goods used in Georgia. Specifically, the evidence shows that TTK sells its products to consumers in the United States through large retailers like Walmart, Target, Kmart, Kohl's, Belk, Sears, Macy's and JC Penny.[16] Walmart alone sells "1000+" TTK-branded products that it markets both online and in physical stores,[17] 214 of which are in Georgia.[18] Just one of those 1000+ products—the Farberware-branded pressure cooker that allegedly injured Ejikeme—has been distributed over 4000 times to physical stores in Georgia,[19] and over 227,000 times to Wal-Mart stores nationwide.[20] Overall, TTK has sold more than one million pressure cookers to U.S. consumers.[21]

---

[15] ECF 55, ¶ 26.

[16] ECF 74-14, at 6.

[17] ECF 74-30, at 2.

[18] ECF 74-29, at 2.

[19] *See* ECF 91-3.

[20] ECF 92-4, at 2.

[21] ECF 74-4, at 6.

From this evidence, the Court can reasonably infer that TTK's Georgia revenue is not limited to Farberware-branded pressure cookers sold in Wal-Mart stores, and that the total revenue TTK derives in Georgia from its products—hundreds of varieties sold by a constellation of big-box retailers—is "substantial." *See Collett v. Olympus Med. Sys. Corp.*, 437 F. Supp. 3d 1272, 1278 (M.D. Ga. Jan. 22, 2020) (inferring substantial revenue in Georgia from record of nationwide sales) and *Quashie v. Olympus Am., Inc.*, 315 F. Supp. 3d 1329, 1336 (N.D. Ga. June 19, 2018) (inferring substantial revenue in Georgia from "bare minimum" allegations that defendant placed goods into "stream of commerce"). Notwithstanding the conclusory testimony of TTK's Wholetime Director, K. Shankaran, to the contrary,[22] the Court draws the inference of substantial revenue in Ejikeme's favor and determines that Subsection (3) of § 9-10-91 authorizes long-arm jurisdiction over TTK.

### C. The Court Has Personal Jurisdiction over TTK Under the Due Process Clause of the Fourteenth Amendment.

Even where § 9-10-91 is satisfied, a court cannot exercise personal jurisdiction over a nonresident defendant in a way that violates procedural due process. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). The Due Process Clause of the Fourteenth Amendment "protects an individual's

---

[22] ECF 70-1, at 22 ¶ 17 ("TTK Prestige has never … derived substantial revenue from goods used … in the State of Georgia.").

liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (cleaned up). Here, in other words, forcing TTK to defend itself in Georgia is not fair or reasonable unless TTK has some kind of relationship to the State. *See Ford*, 141 S. Ct. at 1024 (focusing on "the defendant's relationship to the forum state"). The requisite relationship depends on whether the personal jurisdiction exercised by the court is general or specific, *id.*; here, Ejikeme only argues that the personal jurisdiction is specific.

The Eleventh Circuit analyzes specific jurisdiction in three (somewhat duplicative but useful) steps. *Del Valle v. Trivago GmbH*, 56 F.4th 1265, 1275 (11th Cir. 2022). Step one asks whether the plaintiff's claims "arise out of or relate to one of the defendant's contacts with the forum." *Id.* (citations omitted). Step two asks whether the defendant "purposefully availed itself of the privilege of conducting activities within the forum." *Id.* (citations omitted). The first two steps are the plaintiff's burden; only if their requirements are met does the analysis move to step three, which asks whether exercising personal jurisdiction would "violate traditional notions of fair play and substantial justice." *Id.* The nonresident defendant bears the burden of making a "compelling case" at step three, else specific jurisdiction will be proper. *Id.*

7

### 1.     Ejikeme's Injuries Relate to TTK's Contacts with Georgia.

Step one of the specific-jurisdiction analysis looks at the "relatedness" of the nonresident defendant's contacts with the forum and the litigation. *Id.*; *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1229 (11th Cir. 2023). Relatedness is established by an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* Here, Ejikeme was injured in Georgia by a TTK-manufactured product that she bought in Georgia; this activity—in the forum State and subject to its regulation—establishes the requisite relatedness between TTK, Georgia, and this litigation.

Put another way, one of TTK's contacts with the forum state is through the sale of its products in Wal-Mart stores physically located in Georgia. Regardless of whether that contact is a sufficient basis for personal jurisdiction (that is a question for step two), the fact that a Georgia Wal-Mart store sold Ejikeme the pressure cooker that caused her injuries demonstrates that the harm she suffered arises out of or relates to TTK's contacts with Georgia.

### 2.     TTK Has Purposefully Availed Itself of Georgia Through Minimum Contacts.

Step two of the specific-jurisdiction analysis looks at so-called "purposeful availment." *Del Valle*, 56 F.4th at 1275. In unintentional tort cases like this one, purposeful availment exists where the nonresident defendant's contacts with the forum state (a) are related to the litigation, (b) include an act of purposeful

8

availment, and (c) give rise to a reasonable anticipation of litigation in the forum state.[23] *Id.* at 1276. Here, Ejikeme identifies the following relevant contacts between TTK and Georgia:

1. Ejikeme purchased, used, and was injured in Georgia by the TTK-manufactured pressure cooker;[24]

2. TTK underwent a Walmart audit of its pressure-cooker-producing factory in India for the purpose of becoming a Walmart supplier;[25] and

3. TTK shipped 227,000 pressure cookers to the United States to be sold in Wal-Mart stores, over 200 of which are in Georgia and which themselves sold over 4,000 TTK-made pressure cookers.[26]

These, considered "collectively," constitute the "minimum contacts" necessary to establish that TTK purposefully availed itself of the State of Georgia.[27] *Id.*

---

[23] The Court cannot help but note the similarity between the Eleventh Circuit's three-part analysis for specific personal jurisdiction (relatedness, purposeful availment, fairness) and its three-part analysis for purposeful availment (relatedness, an act of purposeful availment, reasonable anticipation).

[24] ECF 92-2, at 18.

[25] *Id.* at 11.

[26] *Id.* at 12.

[27] Ejikeme also argues that shipments of numerous 20-foot containers filled with TTK cookware to the port of Savannah, Georgia is a relevant contact. *Id.* at 5. TTK responds that the shipments are a red herring because they were sent by a non-party trading intermediary and contained no pressure cookers. ECF 90-1, at 7–9. The Court reaches its conclusion as to personal jurisdiction without determining how the pressure-cooker-less shipments should weigh in the due process analysis.

As to (a) relatedness, the Court has already established in the previous section that TTK's contacts with Georgia are related to this litigation.

As to (b) purposeful availment, TTK has purposefully availed itself of Georgia through its active partnership with Walmart. A nonresident defendant purposefully avails itself of a state when it "deliberately reach[es] out beyond its home" and establishes contacts with the foreign state. *Skyhop*, 58 F.4th at 1230. These contacts must be by the defendant's "own choice," as opposed to "random, isolated, or fortuitous." *Id.*

Here, TTK deliberately reached out beyond its home in India by taking active steps to become a Walmart supplier. Ejikeme asserts, and TTK does not deny, that becoming a Walmart supplier is no easy task.[28] In support of her assertion, Ejikeme points to the results of a 2016 audit of TTK's pressure-cooker-producing facility in Hosur, India.[29] The audit, designated as "INITIAL" and "NEW," was apparently performed by a third party,[30] but its results were delivered on Walmart letterhead.[31] Near the top of the audit results is an "Executive Summary" that includes information on the audited facility like

---

[28] ECF 92-2, at 19.

[29] ECF 92-16, at 2.

[30] *Id.* (bearing "Third party report No." and directing that follow-up documents be send to "third party office").

[31] *Id.*

business turnover, production lead times, in-house testing capability, accreditation, management structure, and quality-control procedures.[32] Following the Executive Summary and comprising the bulk of the audit results is a "Violation Summary" listing over 40 facility violations in areas including pay[33] and benefits,[34] environmental regulation,[35] occupational safety,[36] and emergency protocols.[37] For each violation, the audit results include comments under the following headings: "DESCRIPTION OF NON COMPLIANCE," "LOCAL LAW," "WALMART REQUIREMENT," "MANAGEMENT COMMENTS," and "AUDITOR COMMENTS."[38] The comments, as the headings indicate, explain how the facility has violated the requirements imposed by Walmart on its suppliers—*e.g.*, with regard to overtime pay[39]—and set forth the corrective action that the facility will take in the future.[40] In addition, the audit results require "factory management"—

---

[32]  *Id.*

[33]  *E.g.*, *id.* at 4 ("UNCLEAR WAGE SYSTEMS").

[34]  *E.g.*, *id.* at 5 ("INSUFFICIENT INSURANCE COVERAGE").

[35]  *E.g.*, *id.* at 12 ("NO PERMITS FOR WASTEWATER").

[36]  *E.g.*, *id.* at 8 ("PPE / CHEMICAL SAFETY").

[37]  *E.g.*, *id.* at 17 ("EMERGENCY EXIT ROUTES ARE OBSTRUCTED").

[38]  *E.g.*, *id.* at 4.

[39]  *Id.* at 6.

[40]  *E.g.*, *id.* at 4 ("The said points will be discussed in our plant committee and the reply for each point will be entered within next 03 days. Disposal actions were

that is, TTK—to execute a "Corrective Action Plan" and deliver it to the auditor within 60 days.[41] The audit results instruct TTK to "strictly implement" the Plan, in a timely fashion, and warn that failure to do so may result in temporary or permanent cancelation of orders.[42] Nor was this an empty threat: on at least one occasion, TTK's Hosur facility was placed in an "Inactive" status and made ineligible to receive purchase orders after it failed a Walmart security audit.[43] The facility was asked to "correct all findings" related to its security failures and pass another security audit before it could regain its Walmart-order eligibility.[44]

From this evidence the Court can reasonably draw the following inferences in Ejikeme's favor: TTK contacted Walmart about becoming a supplier. TTK cooperated with, at Walmart's request and for Walmart's benefit, an initial audit of its pressure-cooker-producing facility in Hosur. TTK timely drafted, submitted, and implemented a Corrective Action Plan addressing the 40-plus ways in which its Hosur facility violated Walmart's supplier requirements. TTK, to implement the Plan, significantly updated the labor, safety, and environmental practices at its

---

[sic] possible will be done within a week. Action plans and start for implementation will be done within 30 days.").

[41]   *Id.* at 2.

[42]   *Id.*

[43]   *Id.* at 31.

[44]   *Id.* (emphasis in original).

Hosur facility. And TTK has, for over seven years, taken active steps to remain in compliance with Walmart's supplier requirements including, on at least one occasion, arranging for a remedial audit to certify its compliance with Walmart's security standards. In sum, the evidence supports the reasonable inference that TTK cultivated a commercial relationship with Walmart for the purpose of selling its products to Walmart consumers in the United States—which included a significant amount of sales in Georgia.

In rebuttal, TTK asserts that its knowledge and responsibility end where its layered and dispersed distribution scheme begins. According to TTK, its business consists of manufacturing products and selling them to trading companies to do with the products as they see fit. TTK simply places products into the proverbial stream of commerce; it neither controls the course of travel nor knows the destination. Thus, when it comes to the pressure cookers, TTK claims it has "no direct dealing"[45]—for that matter "no business connection" whatsoever[46]—with either Meyer or Walmart. TTK knows that Meyer distributes the pressure cookers,

---

[45] ECF 70-1, at 23 ¶ 9.

[46] *Id.* ¶ 11.

but asserts that it does not know where or how; as TTK sees it, if Meyer sells the pressure cookers to Walmart, that is not TTK's business.[47]

TTK's narrative is undermined by the evidence. Its director, Shankaran, denied under oath the existence of any direct dealing between Meyer and TTK; yet there are emails between Meyer and TTK executives[48] with subject lines like "Re: Farberware Pressure Cookers,"[49] and on topics like "the need to improve the transparency and clarity of our communication."[50] Shankaran swore that no business connection existed between Walmart and TTK; yet there are records showing multiple Walmart audits of the TTK facility in which the pressure cookers are allegedly manufactured, and an email to a TTK executive referencing pressure cookers shipped pursuant to a "Walmart order."[51] Shankaran swore that TTK had

---

[47] *Id.* ¶ 12 ("[Defendant TTK]'s only knowledge with respect to the destination of the pressure cookers that it sells … is that those goods will be transmitted to [Defendant Meyer].").

[48] The 2016 email exchanges in question include Geri Buhl (Meyer's Merchandising Director in 2016, ECF 92-9, at 5), Chandru Kalro (TTK's Executive VP of Marketing in 2019, ECF 74-14, at 3) and a TTK employee named Rajkumar. Rajkumar's position in TTK is unclear, but the Court makes the reasonable inference that he occupies a position in senior management based on the other participants in the email chain (senior managers) and the subject matter of the emails (inter-company coordination, ECF 92-11, at 2; scheduling of product inspection and shipping dates, ECF 92-15, at 2–4).

[49] ECF 92-10, at 2.

[50] ECF 92-11, at 2.

[51] ECF 92-15, at 2.

no knowledge of where its products go; yet here also is Shankaran swearing to the specific contents of shipping containers coming ashore in Savannah,[52] and TTK asserting that its pressure cookers only travel through ports in Oakland, New York, Newark, and Norfolk.[53]

These discrepancies spark serious doubts about whether TTK is as blind to the downstream movement of its products as it wants the Court to believe. And Shankaran's testimony, in light of its inconsistency both with itself and with other evidence, raises more questions than it answers. But the Court need not make any credibility determinations because, resolving factual disputes in Ejikeme's favor, it easily concludes that TTK deliberately reached out beyond its home in India and purposefully availed itself of Walmart's retailing prowess.

And by purposefully availing itself of Walmart, TTK purposefully availed itself of Georgia. The sale of TTK's products in Georgia is not random, isolated, or fortuitous. Walmart operates more stores in Georgia than in 45 other states.[54] TTK's sales in Georgia are continuous and systemic to the tune of thousands of products in hundreds of stores for the greater part of a decade.[55] And TTK's

---

[52] ECF 78-1, ¶ 3.

[53] ECF 93, at 3.

[54] ECF 92-2, at 12.

[55] The volume of TTK's sales distinguish this case from *J. McIntyre Machinery, Ltd. v. Nicastro*, in which the Supreme Court declined to exercise personal

products did not end up in Georgia by accident: They ended up there because TTK deliberately partnered with a retailer that would get them there—that is to say, by choice.

If TTK had applied to become a supplier, submitted to audits, and changed its factory operating procedures for a *Georgia-specific* retailer, and sold thousands of products to Georgia citizens via the retailer's online marketplace and 200-plus Georgia stores, there would be little room to argue that TTK has not purposefully availed itself of Georgia. Here, the only difference is that the retailer *also* has stores in 49 other states. But Walmart's nationwide footprint does not change the analysis for Georgia. TTK argues, in effect, that it can immunize itself from the consequences of its torts in Georgia by engaging business in every other state too.[56] That cannot be. By deliberately exploiting Walmart's extensive Georgia retailing infrastructure to target Georgia consumers, TTK has purposefully availed itself of Georgia.

---

jurisdiction over a defendant that had sent no more than four products—and perhaps as few as one—into the forum state. 564 U.S. 873, 879 (2011).

[56] *See* ECF 93, at 13 (arguing that TTK's exploitation of a "nationwide distribution system that might lead to its products being sold in any of the fifty states" does not support specific jurisdiction).

Third and finally, as to (c) reasonable anticipation, TTK could have reasonably anticipated that it would be sued in Georgia.[57] A nonresident defendant that "continuously and deliberately exploit[s]" a forum state's market should reasonably anticipate products liability litigation in that forum. *Ford*, 141 S. Ct. at 1027. Reasonable anticipation gives the defendant notice of its legal exposure in a state such that the defendant "could do something about that exposure." *Id.*

Here, the reasonable anticipation requirement is easily satisfied. TTK, by continuously and deliberately selling its products through Walmart, could reasonably anticipate that its products would be sold in Walmart stores in Georgia; thus, it could reasonably anticipate that its products' alleged defects would injure Georgia citizens; thus, it could reasonably anticipate suit in Georgia. As a sophisticated commercial actor, TTK had more than enough notice of its potential legal exposure in Georgia to do something about it if it wished. The cost of TTK's decision to continue to exploit Georgia's markets is TTK's to bear. Because Ejikeme has shown that TTK (a) caused an injury related to its contacts with Georgia, (b) purposefully availed itself of Georgia, and (c) could have reasonably

---

[57] TTK argues that the applicable legal standard is not reasonable anticipation but "actual knowledge," a phrase it apparently copped from a single opinion from the Southern District of Florida. ECF 93, at 8. "Actual knowledge" is untethered to either Supreme Court or Eleventh Circuit precedent and the Court declines to adopt it. The Court adds that, as a factual matter, TTK's lack of "actual knowledge" is less than settled.

anticipated suit in Georgia, she has established that TTK's availment of Georgia was purposeful.

### 3. Subjecting TTK to Specific Jurisdiction in Georgia Is Consistent with Fair Play and Substantial Justice.

Because Ejikeme has established that her injury relates to TTK's contacts with Georgia and that TTK has purposefully availed itself of Georgia, the specific-jurisdiction analysis moves to the third step, at which TTK can make its case that subjecting it to specific jurisdiction in Georgia would offend "fair play and substantial justice." *Del Valle*, 56 F.4th at 1277. Only a "compelling" case can negate personal jurisdiction. *Id.* at 1275. The Eleventh Circuit evaluates fairness under four factors: (1) the defendant's burden; (2) the forum's interest; (3) the plaintiff's interest; and (4) the judicial system's interest. *Id.* at 1277.

TTK does not argue that personal jurisdiction would be unfair or unjust under any of these factors—and for good reason, as the equities favor Ejikeme. *See SkyHop*, 58 F.4th at 1231 (exercising personal jurisdiction over a defendant that made no argument under the fairness factors). TTK is not the "Appalachian potter" of first-semester-law-school fame, spinning cups and saucers of handmade clay. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 891 (2011) (Breyer, J., concurring in the judgment). TTK has boasted that it "operates in every continent

18

in the globe,"[58] earns tens of millions of dollars in annual revenue,[59] and owns the "leading pressure cooker brand" in the United States,[60] where it has sold over one million pressure cookers. It is not unduly burdensome for a kitchenware multinational that explicitly targets U.S. consumers[61] to defend itself in U.S. courts from consumers of its kitchenware. Georgia, of course, has a strong interest in ensuring that Georgia citizens are compensated for injuries suffered in Georgia from products purchased and used in Georgia, just as Ejikeme has a strong interest in righting an alleged wrong suffered in her home kitchen without traveling halfway around the world. And the Court has an interest in providing a forum for Ejikeme to litigate her claims; for if TTK is not subject to a Georgia court's personal jurisdiction for a suit so thoroughly bound up in Georgia, the Court wonders whether TTK would be subject to personal jurisdiction anywhere.

In his *Ford* concurrence, Justice Alito rhetorically asks who could seriously argue that specific jurisdiction over a defendant is "fundamentally unfair" in a state whose own resident, having purchased the defendant's product within the

---

[58] ECF 74-14, at 6.

[59] ECF 74-4, at 6 (estimating revenue for the fiscal year ending in March 2020 at 248.21 crore Indian Rupees, worth well over $20 million U.S. Dollars).

[60] ECF 74-14, at 6.

[61] *See* ECF 74-8, at 3 (explaining to investors in 2006 TTK's plan to "increase the distribution [of] pressure cookers" in the U.S. market).

state's own borders, was injured by an accident in that state. 141 S. Ct. at 1032 (Alito, J., concurring in the judgment). In a similar vein, the *Ford* majority holds up the following fact pattern as the "paradigm case of specific jurisdiction": an in-state plaintiff, injured in an in-state accident by an allegedly defective product, bringing personal injury claims in an in-state court. *Id.* at 1027. Here is such a paradigm case. Consistent with fundamental fairness, the Court exercises specific jurisdiction over TTK.

### III.  CONCLUSION

TTK's motion to dismiss for lack of personal jurisdiction [ECF 90] is **DENIED**. TTK's answer is due 14 days after the entry date of this Order. The parties' Joint Preliminary Report and Discovery Plan is due 30 days after TTK files its answer.

**SO ORDERED** this 29th day of March, 2024.

Steven D. Grimberg
United States District Judge